# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TOM GARNER, | * | |
| Individually and on behalf of all others | * | |
| similarly situated | * | |
| | * | |
| Plaintiff | * | CASE NO. |
| | * | |
| versus | * | |
| | * | SECTION |
| BP, plc, BP EXPLORATION AND PRODUCTION, | * | |
| BP AMERICA, INC., ANADARKO PETROLEUM | * | |
| CORPORATION, MITSUI OIL EXPLORATION | * | |
| CO., LTD, TRANSOCEAN, LTD., TRANSOCEAN | * | |
| OFFSHORE DEEPWATER DRILLING, INC., | * | MAGISTRATE |
| TRANSOCEAN DEEPWATER, INC., | * | |
| HALLIBURTON ENERGY SERVICES, INC., | * | |
| CAMERON INTERNATIONAL CORPORATION | * | JURY DEMAND |
| f/k/a COOPER CAMERON CORPORATION, | * | |
| | * | |
| Defendants | * | |
| | * | |

**************************************************

# CLASS ACTION COMPLAINT
# FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff, Tom Garner ("Plaintiff"), individually and as representative of the class defined herein (the "Class"), brings this action against the defendants identified below ("Defendants"), and avers as follows:

## INTRODUCTION

1.

This is a class action, brought pursuant to Rule 23 of the Federal Rules of Civil Procedure (1) to compel compliance with (a) the provisions of the Outer Continental Shelf Lands Act ("OCSLA") and implementing regulations enacted thereunder, which are applicable to the

operations conducted on the outer Continental Shelf by all Defendants; and (b) the terms of a lease for exploration of the Macondo prospect site in Mississippi Canyon Block 252 (the "Lease") and permits therefor ("Permits")  issued to three of the Defendants by the Mineral Management Service ("MMS"), which are currently being violated by Defendants; (2) for injunctive relief against all Defendants; and (3) to recover damages (including reasonable attorney and expert witness fees) suffered by Plaintiff and the Class Members as a result of those violations and the ongoing oil spill that followed the explosion and fire aboard, and subsequent sinking of, the oil rig Deepwater Horizon (hereinafter "Deepwater Horizon"or "Oil Rig") on April 20, 2010, at about 10:00 p.m. central time on the outer Continental Shelf, off the Louisiana coast.  Following the sinking of the Oil Rig, over 5,000 barrels per day of crude oil have been leaking from the Macondo oil well upon which the Deepwater Horizon was performing completion operations, and from the riser pipe that originally connected the Deepwater Horizon to the well, which now lies on the ocean floor.  The ever-growing oil spill has already caused serious and permanent environmental damage to the Louisiana coast, with detrimental effects upon the Gulf of Mexico's and Louisiana's marine environments, coastal environments and estuarine areas, all of which are used by Plaintiff and the Class Members for different activities, including recreational and commercial fishing, oyster harvesting, to earn a livelihood, and for other recreational and non-recreational purposes.  The oil spill has also caused damage to Louisiana's wetlands, which are the first line of defense from storms and hurricanes, thereby exposing Louisiana residents to hurricane damages.

## PARTIES

2.

Plaintiff, Tom Garner, is a citizen of Louisiana who resides within this district in Mandeville, Louisiana. Plaintiff is a sport fisherman who regularly fishes in the Gulf of Mexico and in the "coastal zone" (as that term is defined in 43 U.S.C. §1331(e)) (the "Coastal Zone"). The violations committed by the Defendants, which are set out below, constitute an imminent threat to the public health and safety and have immediately affected Plaintiff's rights (and the Class Members' rights) to use the Gulf of Mexico and the Coastal Zone for those purposes described above. As a result of the events described above and below, Plaintiff and the Class Members have suffered damages that are more fully described below.

3.

Defendants herein are:

(a)     Transocean LTD. ("Transocean Holdings") is a foreign corporation doing business in the state of Louisiana. Transocean Holdings is a financially responsible party for the conduct of the Transocean entities named herein.

(b)     Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore") is a Delaware corporation doing business in the state of Louisiana, with its principal place of business in Houston, Texas.

(c)     Transocean Deepwater, Inc. ("Transocean Deepwater") is a Delaware corporation doing business in the state of Louisiana, with its principal place of business in Houston, Texas.

(d)     Transocean Holdings, Transocean Offshore and Transocean Deepwater (collectively "Transocean") directly or through wholly-owned subsidiaries, owns, has partial ownership interests in, or operates 138 mobile offshore drilling units. Transocean operated the

Deepwater Horizon, which was leased to BP (as defined below).  At the time of the April 20, 2010 explosion described later in this complaint, both Transocean and BP were in control of the Deepwater Horizon, with BP employees providing instructions as to where and how to drill.

(e)     BP, plc ("BP, plc") is a corporation organized and existing under the laws of the United Kingdom, with its principal place of business in London, England.  BP, plc is one of the three largest integrated energy services companies in the world, with more than 100,000 employees and operations in more than 100 countries on six continents.  BP, plc is doing business in the state of Louisiana.

(f)     BP Exploration and Production, Inc. ("BP Exploration") is a foreign corporation doing business in the state of Louisiana.

(g)     BP America, Inc. ("BP America") is a foreign corporation doing business in the state of Louisiana.

(h)     BP Products North America, Inc. ("BP Products") is a foreign corporation doing business in the state of Louisiana.

(i)     Halliburton Energy Services, Inc. ("Halliburton") is a Delaware corporation doing business in the state of Louisiana, with its principal place of business in Houston, Texas. Halliburton is a leading provider of oilfield technology, including fluid management and technologies to assist in the drilling and construction of oil and gas wells.  Halliburton was a subcontractor to the Deepwater Horizon, providing cementing services at the well, as supervised by BP employees under the direction and control of BP, plc, BP Exploration, BP America and/or BP Products (collectively "BP" or the "BP Defendants").

(j)     Cameron International Corporation f/k/a Cooper-Cameron Corporation ("Cameron") is a foreign corporation doing business in the state of Louisiana.  Cameron is a

leading provider of flow equipment products, systems and services to worldwide oil, gas and process industries.  Cameron manufactured the blowout preventers ("BOPs") on the Deepwater Horizon rig that failed to function properly.

(k)     Anadarko Petroleum Corporation ("Anadarko") is a foreign corporation doing business in Louisiana.

(l)     Mitsui Oil Exploration Co., Ltd. ("Moeco") is a foreign corporation doing business in Louisiana.

<u>**JURISDICTION AND VENUE**</u>

4.

This Court has jurisdiction over this class action pursuant to (1)  43 U.S.C § 1349(b)(1) because this case arises out of , or in connection with operations conducted by Defendants on the outer Continental Shelf for the exploration, development, or production of the minerals (oil) of the subsoil and seabed of the outer Continental Shelf;  (2) 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and it is a class action brought by citizens of a State that is different from the State where at least one of the Defendants is incorporated or does business; (3) 28 U.S.C. § 1331, because the claims asserted herein arise under the laws of the United States of America, including the laws of the State of Louisiana which have been declared, pursuant to 43 U.S.C. §§ 1331 (f)(1) and 1333(a)(2), to be the law of the United States for that portion of the outer Continental Shelf from which the oil spill originated; and (4) 43 U.S.C. § 1333(a)(1), which extends exclusive Federal jurisdiction to the outer Continental Shelf.

5.

Prosecution of this action in this district is proper under (1) 43 U.S.C § 1349(b)(1)(B)

because the Eastern District of Louisiana is the judicial district nearest the place where this cause of action arose; and (2) 28 U.S.C. § 1391(a)(2) because all the events or omissions giving rise to the claims asserted herein occurred in this district.

## FACTUAL ALLEGATIONS

6.

Transocean, Ltd., Transocean Offshore and Transocean Deepwater (collectively "Transocean") are the operators of the Deepwater Horizon, a semi-submersible mobile drilling rig, which was performing completion operations for BP on the outer Continental Shelf, at the site from which the oil spill described below now originates, on April 20, 2010.

7.

Minerals Management Service ("MMS") is a bureau of the United States Department of the Interior.  The mission of MMS in the  Mexico is to manage the mineral resources of the outer Continental Self in an environmentally sound and safe manner.

8.

BP, Anadarko and Moeco are the holders of the Lease, which was granted by MMS and is valid through September 2013, that allows BP to drill for oil and perform oil production-related operations at the site of the oil spill.  BP leased the Deepwater Horizon to drill an exploratory well at the Macondo prospect site in Mississippi Canyon Block 252, located on the outer Continental Shelf off the coast of Louisiana.  On April 20, 2010, the BP Defendants operated the oil well that is the source of the oil spill.

9.

Cameron manufactured and/or supplied the Deepwater Horizon's BOPs that should have prevented the oil spill, but failed to operate upon the explosion.  The BOPs were defective

because they failed to operate as intended.

10.

Halliburton was engaged in cementing operations of the well and the well cap and, upon information and belief, improperly and negligently performed those duties, allowing gas to escape from the well and contributing to the fire, explosion and resulting oil spill.

11.

At all times material hereto, the Deepwater Horizon was owned, manned, possessed, managed, controlled, chartered and/or operated by Transocean and/or BP.

12.

Transocean, or its predecessors, designed the Deepwater Horizon.

13.

The fire and explosion on the Deepwater Horizon, its sinking and the resulting oil spill were caused by the combined and concurring negligence of Defendants, which renders them liable, jointly, severally and *in-solido*, to Plaintiff and the Class Members for damages.

14.

On April 20, 2010, at approximately 9:45 p.m. CST, a mass of oil, natural gas, drilling mud and salt water erupted from the wellhead at the Macondo prospect site in the Gulf of Mexico off the shores of Louisiana, engulfing the Deepwater Horizon in fire and sinking the rig 36 hours later.

15.

Prior to its destruction, the rig was an ultra-deepwater dynamic-positioned, semi-submersible oil rig.  The rig was positioned about 50 miles southeast of Venice, Louisiana, in

water nearly 5,000 feet deep.  At the time of the explosion, drilling was being conducted at over 22,000 feet – 2,000 feet deeper than allowed by the Permits issued by the MMS.

16.

The leak is spilling, by conservative estimates, over 5,000 barrels of petroleum – equivalent to over 200,000 gallons – into the Gulf of Mexico each day.  Recent reports suggest that these estimates are woefully low, and that the actual flow could be as great as 100,000 barrels a day.

17.

The risks of offshore drilling were well known to Defendants, and are especially high in the Gulf of Mexico, where floating rigs are used, unlike the permanent rigs used in other areas, such as the North Sea.  Permanent rigs are anchored to the ocean floor and less vulnerable, while floating rigs are far more precarious and subject to serious accidents.

18.

There had been numerous previous spills,  fires and other serious incidents on the Deepwater Horizon rig, which was issued citations for "acknowledged pollution source" by the United States Coast Guard some 18 times in the last 11 years.  In 2005, the Deepwater Horizon rig was badly burned by a fire and in 2008, a valve opened and flooded the rig with seawater, causing substantial damage.

19.

At the time of the explosion on April 20, 2010, the Deepwater Horizon was not producing any oil.  The rig had drilled a well in the sea floor and was attached thereto and was in one of the last phases of the exploratory operations prior to turning the well into a production

well.  In this final phase, Halliburton workers on the rig, under the supervision and control of BP employees, were attempting to create a cement seal to plug off the wellhead.  BP employees under the supervision and control of one or more of the BP Defendants had authority over the Halliburton workers to determine the type and amount of cement to be used.

20.

Cementing a wellhead, particularly in deep water, is delicate work that carries the risk of a blowout, or an uncontrolled release of oil and/or natural gas from the well.  Defendants knew that the work being performed at the Deepwater Horizon rig was especially risky.

21.

The April 20, 2010 explosion and fire led to an uncontrolled oil leak in the Gulf of Mexico, covering at least 3,850 square miles of fragile ocean and wetlands marine life.  The disaster threatens to become the worst oil spill in history – far worse than the 1989 Exxon Valdez disaster – endangering the coasts of Louisiana, Mississippi, Alabama, and Florida for generations to come and wiping out the habitat of hundreds of species of marine and oceanic life.  More than 400 species, including whales and dolphins, face a dire threat from the spill, along with the coastlines, islands, and marshlands.

22.

Despite their eagerness and capacity for drilling, BP and other oil companies engaged in offshore oil production have not taken sufficient precautions to prevent disasters such as the current oil spill and have violated the terms of their leases and permits issued by the MMS to conduct operations in the outer Continental Shelf.

23.

By conservative estimates, the current oil spill totals 3.5 million gallons and counting, more than a third of the Exxon Valdez spill.  As noted above, however, recent reports estimate that the spill may be much greater than reported and may soon surpass the Exxon Valdez spill, if that has not already occurred.  Even if the spill were to be stopped immediately, the impact on the economy and ecology of the Gulf of Mexico region will exceed that of the Exxon Valdez spill.  New reports just released increased the flow from the riser pipe to the amount of oil spilled exceeds the Exxon Valdez disaster and will continue in a like amount in every four or five days.

24.

Although Defendants' activities are supposed to be overseen by the MMS, a 2008 investigation revealed that the MMS employees in Denver and Washington, D.C. had received bribes from oil company officials, had rigged contracts, and had engaged in sexual relationships with oil company employees.  The United States Inspector General concluded one report by stating that investigations revealed "a culture of substance abuse and promiscuity."  In 2009, the formal regional supervisor of the Gulf of Mexico region for MMS pled guilty and was sentenced to a year's probation in federal court in New Orleans for lying about receiving gifts from an offshore drilling contractor.

  a. This is the same MMS that acceded to industry demands not to mandate a backup shut off switch.

  b. One such backup shut off switch is an acoustical regulator – a remotely triggered switch that might have closed off BP's pipe at the wellhead when the manual switch failed – which is required by law for all offshore rigs in Brazil and Norway.  BP uses the device voluntarily in Britain and elsewhere in the world.

-10-

But it did *not* use the device in the Deepwater Horizon.  This cost-saving measure – the acoustical regulators cost approximately $500,0000 – comes at a potential cost of billions of dollars to the Gulf Coast.

c.  BP also failed to install a deep hole shut off valve – another fail-safe that might have averted the spill.  And BP appears to have drilled to depths of 22,000-25,000 feet instead of the 18,000 foot maximum allowed by its permits.

d.  According to the International Regulators' Forum, a group of offshore regulatory bodies, the U.S. reported five major "loss of well control" incidents in 2007 and 2008, the most recent years for which data are available.  The five other countries in the forum that reported the data (U.K., Norway, Australia, Canada and Netherlands) reported no such incidents.

25.

Much of the harm that the spill is causing on a daily basis is irreparable.

26.

Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to Plaintiffs (and the Class Members), and the Gulf of Mexico's marine and coastal environments, where people work and earn a living.  Upon information and belief, a meeting occurred prior to the explosion in which BP engineers in Houston advised not to put in the second concrete plug and to proceed with removing the mud and shutting in the well.  The blowout preventer was ten years old and had not been recalibrated, maintained and/or tested appropriately, all which violate Federal requirements as annunciated by the MMS.

27.

The spilled oil has caused, and will continue in the future to cause, dangerous environmental contamination of the Gulf of Mexico and its shorelines, substantially damaging the Gulf's natural resources.

28.

The oil spill and the contamination have caused and will continue to cause loss of revenue to persons and businesses who are being prevented from using the Gulf of Mexico and its coastline.

29.

There are many other potential effects from the oil spill that have not yet become known, and Plaintiff reserves the right to amend this Complaint once additional information becomes available.

## CLASS DEFINITION

30.

Plaintiff brings this action on behalf of himself and all others similarly situated, who are members of the following Class:

> All Louisiana residents who live or work in, or derive income from, the Louisiana "Coastal Zone," as that term is defined in 43 U.S.C. §1331(e), and who have sustained any legally cognizable loss and/or damages as a result of the April 20, 2010 fire and explosion which occurred aboard the Deepwater Horizon drilling rig and the oil spill resulting therefrom.

31.

Excluded from the Class are:

a.      the officers and directors of any of the Defendants;

b.      any judge or judicial officer assigned to this matter and his or her immediate family; and

     c.      any legal representative, successor, or assign of any excluded persons or entities.

## CLASS ACTION ALLEGATIONS

32.

**a.**    **Numerosity of the class**

The proposed Class is so numerous that joinder is impractical. The disposition of the claims asserted herein through this class action will be more efficient and will benefit the parties and the Court.

**b.**    **Predominance of Common Questions of Fact and Law**

33.

There is a well-defined community of interest in that the questions of law and fact common to the Class predominate over questions affecting only individual Class Members and include, but are not limited to, the following:

     a.      Whether Defendants caused and/or contributed to the fire, explosion and oil spill;

     b.      Whether Defendants' actions were negligent;

     c.      Whether the fire, explosion and oil spill have caused environmental or other damage; and

     d.      The amount of damages Plaintiff and the Class Members should receive in compensation.

**c.**    **Typicality**

34.

Plaintiffs and the Class Members have suffered similar harm as a result of Defendants' actions.

**d.**    **Adequacy of Representation**

35.

Plaintiff will fairly and adequately represent and protect the interests of the members of the Class because his interests do not conflict with the interests of the Class Members he seeks to represent. Plaintiff has no claims antagonistic to those of the Class. Plaintiff has retained counsel competent and experienced in complex class actions and maritime and environmental litigation.

**e.**     **Superiority**

36.

A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual litigation of the claims of all Class Members is impracticable. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to this Court in which individual litigation of thousands of cases would proceed. Individual litigation presents a potential for inconsistent or contradictory judgments, and the prospect of a race for the courthouse and an inequitable allocation of recovery among those with equally meritorious claims. Individual litigation increases the expenses and delay to all parties and the court system in resolving the legal and factual issues common to all claims related to the Defendants' conduct alleged herein. By contrast, a class action presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

37.

The various claims asserted in the action are also certifiable under the provisions of Rules

23(b)(1) and/or 23(b)(3) of the Federal Rules of Civil Procedure because:

a.      The prosecution of separate actions by thousands of individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, thus establishing incompatible standards of conduct for Defendants;

b.      The prosecution of separate actions by individual Class Members would also create the risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other Class Members who are not parties to such adjudications and would substantially impair or impede their ability to protect their interests; and

c.      The questions of law or fact common to the Members of the Class predominate over any questions affecting only individual Members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## **COUNT ONE – VIOLATION OF OSCLA**

38.

Plaintiff incorporates by reference each and every allegation set forth above.

39.

Defendants have violated the provisions of OSCLA and regulations enacted thereunder, as well as the leases and permits granted to them by the MMS to conduct operations on the outer Continental Shelf.

40.

-15-

Pursuant to 43 U.S.C. § 1349(b)(2) Plaintiff and the Class Members are entitled to recover all damages they have suffered, including reasonable attorney and expert fees, and they hereby make demand therefor in an amount to be determined by the trier of fact.

## COUNT TWO – NEGLIGENCE

41.

Plaintiff incorporates by reference each and every allegation set forth above.

42.

The fire, explosion and resulting oil spill were caused by the negligence of Defendants.

43.

Upon information and belief, Plaintiff avers that the fire, explosion and resulting oil spill were caused by the joint negligence and fault of Defendants in the following non-exclusive particulars:

a. Failing to properly operate the Deepwater Horizon;

b. Operating the Deepwater Horizon in such a manner that a fire and explosion occurred onboard, causing it to sink and resulting in an oil spill;

c. Failing to properly inspect the Deepwater Horizon to assure that its equipment and personnel were fit for their intended purposes;

d. Acting in a careless and negligent manner without due regard for the safety of others;

e. Failing to promulgate, implement, and enforce rules and regulations pertaining to the safe operations of the Deepwater Horizon which, if they had been so promulgated, implemented and enforced, would have averted the fire, explosion, sinking of the rig, and oil spill;

f. Operating the Deepwater Horizon with untrained and/or unlicensed personnel;

-16-

g.  Failing to take appropriate action to avoid or mitigate the fire, explosion and/or release of oil;

h.  Negligently implementing policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

i.  Failing to ascertain that the Deepwater Horizon and its equipment were free from defects and/or in proper working order;

j.  Failing to timely bring the oil release under control;

k.  Failing to provide appropriate accident prevention equipment;

l.  Failing to react to danger signs;

m.  Providing BOPs that did not work properly;

n.  Conducting well and well cap cementing operations improperly;

o.  Failing to properly design the Deepwater Horizon;

p.  Failing to install and/or deploy an acoustic switch to stop the flow of oil in the event of a failure; and

q.  Such other acts of negligence and omissions as will be shown at the trial of this matter.

44.

As a direct and proximate result of Defendants' negligence, Plaintiff and the Class Members have suffered damages including, but not limited to, damage to the natural resources and loss of income, in an amount to be determined by the trier of fact.

## COUNT THREE –PUNITIVE DAMAGES

45.

Plaintiff incorporates by reference each and every allegation as set forth above.

46.

The fire, explosion and resulting oil spill were caused by the wantonness of Defendants.

47.

Upon information and belief, Plaintiff avers that the fire, explosion and resulting oil spill were caused by the joint wantonness and fault of Defendants in the following non-exclusive particulars:

a. Failing to properly operate the Deepwater Horizon;

b. Operating the Deepwater Horizon in such a manner that a fire and explosion occurred onboard, causing it to sink and resulting in an oil spill;

c. Failing to properly inspect the Deepwater Horizon to assure that its equipment and personnel were fit for their intended purposes;

d. Acting in a wanton manner without due regard for the safety of others;

e. Failing to promulgate, implement, and enforce rules and regulations pertaining to the safe operations of the Deepwater Horizon which, if they had been so promulgated, implemented and enforced, would have averted the fire, explosion, sinking of the rig, and oil spill;

f. Operating the Deepwater Horizon with untrained and/or unlicensed personnel;

g. Failing to take appropriate action to avoid or mitigate the fire, explosion and/or release of oil;

h. Wantonly implementing of policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

i. Failing to ascertain that the Deepwater Horizon and its equipment were free from defects and/or in proper working order;

-18-

j.   Failing to timely bring the oil release under control;

k.   Failing to provide appropriate accident prevention equipment;

l.   Failing to react to danger signs;

m.   Providing BOPs that did not work properly;

n.   Conducting well and well cap cementing operations improperly;

o.   Failing to properly design the Deepwater Horizon;

p.   Failing to install and/or deploy an acoustic switch to stop the flow of oil in the event
     of a failure; and

q.   Such other acts of wantonness and omissions as will be shown at the trial of this
     matter.

48.

As a direct and proximate result of Defendants' wantonness, Plaintiff and the Class Members have suffered damages including, but not limited to, damage to the natural resources and loss of income, in an amount to be determined by the trier of fact.  Defendants wantonly failed to take necessary actions to mitigate the danger associated with their operations.

## COUNT FOUR – NUISANCE

49.

Plaintiff hereby incorporates by reference each and every allegation set forth above.

50.

The actions of Defendants, as described above, interfered and continue to interfere with Plaintiff's rights to enjoy and/or use his/her property and caused hurt, inconvenience and/or damage to Plaintiff and the Class Members.

-19-

51.

Plaintiff and the Class Members are entitled to a judgment finding Defendants liable to Plaintiff for damages suffered as a direct and proximate result of Defendants' nuisance and awarding Plaintiff adequate compensation therefor in an amount to be determined by the trier of fact.

## COUNT FIVE – TRESPASS

52.

Plaintiff hereby incorporates by reference each and every allegation set forth above.

53.

Defendants negligently and intentionally allowed the release of oil into the water which has or will reach Plaintiff's (and the Class Members') property and which will be a continuing trespass onto the property of Plaintiff and the Class Members.  Defendants' conduct in allowing these releases and/or leaks of oil into the water was not only reckless and outrageous, but also became intentional when Defendants failed to take proper precautions to prevent the leaks.

54.

The release of oil into the water was the result of willful misconduct and/or willful negligence within the privity and/or knowledge of Defendants, and was primarily caused by violations of applicable environmental, safety or operating standards, regulations or laws.

55.

As a direct and proximate result of Defendants' continuing trespass and engaging in the above mentioned activities, Plaintiff and the Class Members have suffered damages in an amount in excess of the jurisdictional limits of this Court.

## COUNT SIX – STRICT LIABILITY

56.

Plaintiff hereby incorporates by reference each and every allegation set forth above.

57.

The actions and activities of Defendants, as described above, including, but not limited to, drilling and transporting oil and other pollutants in the Gulf of Mexico, constitutes an abnormally dangerous and/or ultrahazardous activity that carries with it a high degree of risk of harm to individuals, land or chattels of others.

58.

The injuries and damages suffered by Plaintiff and the Class Members were the kind of harm, the possibility of which makes the Defendants' activities abnormally dangerous and/or ultrahazardous.

59.

The above described injuries and damages to the Plaintiff and the Class Members were proximately caused by said abnormally dangerous and/or ultrahazardous activity.

60.

Plaintiff and the Class Members are entitled to a judgment finding Defendants liable to Plaintiff for damages suffered as a result of Defendants' abnormally dangerous and/or ultrahazardous activity and awarding Plaintiff adequate compensation in an amount determined by the trier of fact.

## COUNT SEVEN – NEGLIGENCE *PER SE*

61.

Plaintiff hereby incorporates by reference each and every allegation set forth above.

62.

At all times material hereto, Defendants were negligent *per se* by failing to comply with Federal and State laws.

63.

As a direct and proximate result of their negligence *per se*, Defendants are liable for the fire, explosion and release of oil, causing injuries and damages to Plaintiff and the Class Members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class Members demand judgment against Defendants, jointly, severally and *in-solido* as follows:

a.  Economic and compensatory damages in amounts to be determined at trial;

b.  Punitive damages;

c.  Pre-judgment and post-judgment interest at the maximum rate allowed by law;

d.  Attorneys' fees and expenses;

e.  Injunctive relief (1) requiring all Defendants to comply with the provisions of the OSCLA, regulations enacted thereunder and the terms of leases and permits issued to them by the MMS, and (2) precluding all Defendants from operating any offshore rig in the Gulf of Mexico region without having first complied with all provisions of OSCLA and regulations enacted therunder; without having first met all the requirements of the leases and permits issued to them by the MMS; and without first having implemented sufficient safeguards, including but not limited to acoustic regulators and adequate BOPs to help ensure that no other environmental disaster of this nature occurs in the future ; and

-22-

f.   Such other and further relief available and any relief the Court deems just and

appropriate.

RESPECTFULLY SUBMITTED BY:

BECNEL LAW FIRM LLC
 /s/Daniel E. Becnel Jr.
Daniel E. Becnel Jr. (T.A. LA Bar No.24567)
Matthew B. Moreland (LA Bar No. 24567)
Salvadore Christina, Jr. (LA Bar No. 27198)
P. O. Drawer H
Reserve, LA 70084
(985) 536-1186
(985) 536-6445 Fax
dbecnel@becnellaw.com
mmoreland@becnellaw.com
schristina@becnellaw.com

AND

Camilo K. Salas III (LA Bar No. 11657)
Salas & Co., L.C.
650 Poydras Street
Suite 1660
New Orleans, LA 70130
Telephone: (504) 799-3080
Fax: (504) 799-3085
E-Mail:  csalas@salaslaw.com

AND

Richard J. Arsenault (LA Bar No. 2563)
NEBLETT, BEARD & ARSENAULT
Post Office Box 1190
2220 Bonaventure Court
Alexandria, LA  71309-1190
Telphone:  (318) 487-9874
Facsimile:  (318) 561-2591
rarsenault@nbalawfirm.com

AND

Jerrold S. Parker, Esq. (NY Bar No. 1894666)
Parker Waichman Alonso, LLP

-23-

6 Harbor Park Drive
Port Washington, NY 11050
Telephone:  (516) 466-6500
Fax: (516) 466-666

And
Of Counsel Pro Hac Vice Pending/ MDL No. 2179

Dianne M. Nast (PA Bar No. 24424)
RodaNast PC
801 Estelle Dr
Lancaster, PA 17601

And

Stan Chesley    Ohio Bar No. #0000852
Bill Markovits   Ohio Bar No. #0018514
Waite, Schneider, Bayless & Chesley
1513 4th and vine Tower
Cincinnati, Ohio 45202


Attorneys for Tom Garner,
individually and on behalf of all
others similarly situated.